IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| JOHN C. JOHNSON, | ) | |
| | ) | |
| Petitioner, | ) | CASE NO. 3:10-0419 |
| | ) | CHIEF JUDGE HAYNES |
| v. | ) | |
| | ) | |
| RICKY BELL, Warden, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM

Petitioner, John C. Johnson, filed this pro se action under 28 U.S.C. § 2254 seeking the writ of habeas corpus to set aside his convictions for second degree murder, facilitation to commit especially aggravated kidnaping and especially aggravated robbery. After a review of the petition, the Court appointed the Federal Public Defender to represent Petitioner. In an amended petition,[1] Petitioner asserts claims: (1) that Petitioner's sentence was based upon facts not found by a jury, in violation of Apprendi v. New Jersey, 530 U.S. 466 (2000), and Blakely v. Washington, 542 U.S. 296 (2004); (2) that the state trial court's decision to sever the murder count on remand violated Petitioner's right to due process and his right to a fair trial under the Fifth, Sixth, and Fourteenth Amendments; and (3) that the state courts unreasonably applied Strickland v. Washington, 466 U.S. 668 (1984) to his ineffective assistance of counsel claims based upon his trial and appellate counsel's failures to raise the Blakely and remand claims. (Docket Entry No. 29).

---

[1]Rule 15 of the Federal Rules of Civil Procedure applies to a habeas proceeding. Mayle v. Felix, 545 U.S. 644, 649 (2005); Rule 6(a), Rules Governing Section 2254 Cases. Under Fed. R. Civ. P. 15 (a), the filing of an amended complaint supersedes the prior complaint. Clark v. Tarrant County, 798 F.2d 736, 740-41 (5th Cir. 1986). Thus, the Court deems the second amended petition to supersede the pro se and first amended petition and the claims therein. Unless adopted and supported by legal memorandum and analysis, the Court deems the claims in the pro se and first amended petition to be waived.

In his answer on the motion for summary judgment (Docket Entry No. 32), Respondent contends that Petitioner's Blakely and other claims are procedurally defaulted for Petitioner's failures to present those claims to the state courts.

### A. Review of the State Record

#### 1. Procedural History

On November 3, 1999, a Davidson County, Tennessee jury convicted Petitioner of second-degree murder, facilitation of aggravated kidnaping and especially aggravated robbery. On January 20, 2000, the state trial court sentenced Petitioner to 25 years for the murder conviction, 20 years (concurrent) for the robbery conviction and five (5) years (consecutive) for the kidnaping conviction, for a total effective sentence of 30 years. On direct appeal, the Tennessee Court of Criminal Appeals affirmed Petitioner's convictions, but remanded on the issue of consecutive sentencing, for the state trial court's lack of sufficient factual findings for the consecutive sentence. State v. Johnson, M2000-CD00529-CCA-R3, 2001 WL 208512 (Tenn. Ct. Crim. App., Mar. 1, 2001). On remand, the state trial court made its findings and imposed the original sentence and on appeal, the Tennessee Court of Criminal Appeals affirmed. State v. Johnson, No. M2001-01567-CCA-R3-CD, 2002 WL 533946 (Tenn. Ct. Crim. App., Apr. 10, 2002).

Petitioner filed his State post-conviction petition with claims of ineffective assistance of counsel and prosecutorial misconduct. The state trial court appointed counsel. Petitioner also filed an action for a writ of error coram nobis, citing newly-discovered evidence from a co-defendant who recanted his trial testimony. After a hearing on the post-conviction petition, the state trial court denied the petition. Johnson v. State, No. M2004-02675-CCA-R3-CO, 2006 WL 721300 (Tenn. Ct. Crim. App., March 22, 2006). On appeal, the Tennessee Court of Criminal Appeals consolidated

the post-conviction and coram nobis appeals and reversed, finding the state trial court's failure to instruct the jury on lesser included offenses for second-degree murder prejudicial and concluded that Petitioner's trial counsel was ineffective for failing to present that issue on Petitioner's direct appeal. Id. The Tennessee appellate court remanded for a new trial. Id.

On remand, the state trial court denied bond because the Tennessee Court of Criminal Appeals only vacated Petitioner's second-degree murder conviction and left his convictions for the facilitation of aggravated kidnaping and especially aggravated robbery undisturbed. Petitioner appealed the bond ruling, but the Tennessee Court of Criminal Appeals agreed that only the second-degree murder conviction was reversed. The Tennessee Supreme Court denied Petitioner's application for permission to appeal. Id.

On December 6, 2007, the State moved that state trial court to amend its sentences on the facilitation of aggravated kidnaping and especially aggravated robbery convictions to impose consecutive sentences. The Court granted that motion. A modified judgment for 20 years for the robbery conviction and a consecutive five (5) year sentence for the kidnaping conviction were entered for an effective sentence of 25 years. The State nolle prossed the second-degree murder charge.

Petitioner appealed the state trial court's consecutive sentences and the Tennessee Court of Criminal Appeals reversed and remanded, finding that the state trial court lacked jurisdiction to enter and amend its judgment and ordered the state trial court to impose a kidnaping sentence concurrent with the robbery sentence. On March 15, 2010, the state trial court entered an amended judgment with an effective 20 year sentence for Petitioner's kidnaping and robbery sentences convictions. Pending his State post-conviction appeal, Petitioner filed a pro se action, Case No. 3:08-0049 that

Judge Echols dismissed the petition without prejudice.

## 2. State Courts' Findings[2]

In Petitioner's first direct appeal, the Tennessee Court of Criminal Appeals made lengthy factual findings underlying Petitioner's convictions.

> Defendant John Charles Johnson was indicted by the Davidson County Grand Jury on charges of premeditated first degree murder, murder committed during the perpetration of robbery, aggravated kidnaping, and especially aggravated robbery. The charges resulted from an incident that occurred on August 16-17, 1998 when Defendant and his friend, Jeremiah Hailey, lured Hailey's ex-brother-in-law to a secluded area on a pretext and killed him. Hailey and Defendant were arrested the next day. Hailey pled guilty to second degree murder and was sentenced to thirty years. Pursuant to his plea agreement, Hailey testified as a witness for the State at Defendant's trial.
>
> At Defendant's trial, Jeremiah Hailey testified that the idea to murder his ex-brother-in-law, Joe Dotson, originated as a joke between Hailey and Defendant in the evening on August 16, 1998. The events leading to the murder began earlier that afternoon. Hailey had asked Defendant to meet him at a bar near Opryland to drink beer and watch the races. After consuming numerous beers, Hailey and Defendant went to O'Charley's restaurant and continued to drink beer for another hour or so. At approximately 9 or 10 p.m. they headed to a club called Silverado's where the beer was free. The two men drank until approximately midnight. Hailey testified that he and Defendant drank similar amounts of alcohol and that Defendant did all of the driving that evening.
>
> Hailey testified that after he and Defendant left Silverado's, their conversation turned to the subject of Hailey's sister, Wendy, and her ex-husband, Dotson. Hailey testified that Dotson was "always into something. And he slapped [his sister] around, blacked [sic] her eye, here and there. And they was always having problems." Dotson and Wendy were divorced but had recently decided to get back together. Hailey told Defendant, jokingly, that they "ought to pop him." Hailey testified that he does not remember the exact conversation, only that Defendant basically agreed and said "let's do it." Hailey and Defendant then drove to Hailey's house to pick up his gun. On the way, they fabricated a story for the purpose of enticing Dotson to accompany them to Old Hickory lake.

---

[2]State appellate court's findings can constitute factual findings in a habeas action. Sumner v. Mata, 449 U.S. 539, 546-47 (1981) and have a statutory presumption of correctness 28 U.S.C. § 2254(e).

Hailey testified that after they picked up the gun, Hailey and Defendant drove to Wendy's house where Dotson was living at the time. It was approximately 1:00 a.m. when they arrived, and quite a few people were at the house. Hailey and Defendant went inside. Hailey found Dotson and told him the story that he and Defendant had fabricated, i.e, that Hailey and Defendant met some Mexicans that afternoon who wanted to sell a stolen car with rims on it. (Hailey testified that Dotson "was always buying something stolen, or if it had rims on it.") They told Dotson that the Mexicans were waiting for them at Old Hickory lake and, if Dotson was interested in purchasing the car, he should come with Hailey and Defendant to the lake and meet them. After hearing their story, Dotson agreed to go. The plan was to drive Dotson to the lake and kill him there-nothing else had been discussed.

Hailey testified that Defendant drove the three of them to the lake where they waited for thirty to forty-five minutes before Dotson began to show signs of aggravation. When Dotson asked what was going on, Hailey reached for his gun and started shooting at him. Dotson started running. Hailey fired three shots. Two bullets hit Dotson-one in the shoulder and one in the hip. Dotson jumped into the lake. Defendant jumped in on top of him, grabbed his head and held it under the water for a minute or two. When Defendant came back onto the shore, he and Hailey discussed what they should do next. Dotson was still face down in the water. They decided to move Dotson to the other side of the lake so that the current from the river would carry the body away. Defendant grabbed Dotson's body and dragged it from the water, but it took both of them to hoist it into the trunk of the car. Although Hailey did not observe Defendant take any money from Dotson at this time, Defendant later admitted to Hailey that he had removed some money from Dotson's sock. Defendant told Hailey that he did not want it, however, and gave Hailey half of what he took. Hailey also testified that neither of them beat Dotson, so Hailey could not explain how blood became spattered onto the inside of the trunk of Defendant's car. They were "both crying and just in a mess" at this point.

Hailey testified that it took him and Defendant a couple of minutes to get to the other side of the lake. They unloaded Dotson from the trunk, put him in the water, and gave his body a shove. Dotson was unconscious at this point, and they both thought he was dead but neither of them knew for certain. On the way home, Hailey and Defendant both became concerned about getting into trouble, so they threw the gun into Stone's River and discussed what they should say to the police. Hailey and Defendant decided to tell the police that they drove to the lake with Dotson to meet a group of Mexicans but left without him. They planned to say that after they arrived, Dotson discovered that he knew one of the Mexicans and became engrossed in a conversation with him. Hailey and Defendant then left the lake, assuming that someone there would give Dotson a ride home. When Hailey arrived at home at approximately 2:30 or 3:00 a.m., he woke up his mother and confessed to killing

Dotson.

The next morning, Hailey received a phone call from Defendant. Hailey cautioned Defendant to "stick to th[eir] story." Later, a police officer arrived at Hailey's house to inform them of Dotson's death. The officer also wanted someone to identify Dotson's body. After Hailey told the officer the story about him and Defendant driving with Dotson to the lake to meet some Mexicans, the officer sent detectives to talk with Hailey again and investigate further. The detectives wanted Hailey to come to the police station and to bring Defendant with him. Both agreed to cooperate. Hailey's mother gave them a ride to the police station later that day. In his first interview with the police, Hailey repeated the false story about the Mexicans that he and Defendant had previously agreed upon. Later, in a taped statement, he confessed to killing Dotson.

Robbie Taylor, Dotson's cousin, testified that he lived with Dotson and Wendy prior to Dotson's death and was present when Defendant and Hailey came by to see Dotson in the early morning of August 17, 1998. Taylor testified that he was in the living room playing a game on the television when they arrived. Dotson was in bed at the time. Defendant and Hailey asked Taylor to wake Dotson up, but Taylor refused. Hailey then went to wake Dotson. Defendant stayed in the living room. Five or ten minutes later, Dotson and Hailey emerged from the bedroom talking about a car at the lake. Taylor remembers that Defendant participated in the discussion. When the three of them left, Taylor went to bed.

Steve Underwood, a Metropolitan Nashville Police Department patrol officer, testified that he was on duty the morning of August 17, 1998. At approximately 7 a.m. that morning, Underwood received a call to investigate a report of a body that fishermen had discovered in the river at Old Hickory lake. When Underwood arrived, he observed a body floating face down in the water. Paramedics had already pronounced the person dead but did not move the body. Underwood phoned his supervisor, then notified the police department's Homicide and Identification Unit which then assumed responsibility for the investigation.

Detective Brad Putnam, an officer with the Metropolitan Nashville Police Department, testified that he was a member of the "murder squad" assigned to investigate Dotson's death. When Putnam arrived at the lake at 7:45 a.m., Dotson's body was still floating face down in the water. Putnam observed that Dotson also had injuries to his back. During his investigation, Putnam was told that some of the attendants working the previous night had reported hearing gunshots by the parking area at approximately 3:00 a.m. At the parking area, Putnam discovered two .25 caliber shell casings, two live .25 caliber rounds, one .25 caliber projectile, and a white sock which appeared to match another sock recovered near the body. Shortly thereafter, the victim's fingerprints were identified as those of Michael Joseph

6

Dotson. Detectives Roland and Vogel were sent to notify the family.

When Putnam returned to the murder squad office, Detectives Roland and Vogel informed him that Hailey and Defendant were allegedly the last persons to see the victim alive early that morning. In accordance with standard procedure, the detectives had already informed the two men that Putnam would like statements from them. As a result, Hailey and Defendant showed up in Putnam's office at approximately 4:00 p.m. that afternoon. Putnam interviewed Hailey first, taped his statement, then did the same with Defendant. Although neither were suspects at the outset, this status began to change soon after both statements were heard. Major discrepancies between the two stories emerged, including the number of Mexicans who supposedly showed up at the lake, the time they arrived, and their physical descriptions.

After Putnam's initial interviews with Hailey and Defendant were completed, Putnam sent Defendant to see an officer named Detective Bernard for a second interview and polygraph test (which Defendant agreed to take). Bernard never reached the point where a polygraph was appropriate, however. Defendant incriminated himself during the introductory interview with Bernard, after which, his status changed from witness to suspect. Defendant was then placed under arrest, and Putnam conducted a second interview before which he advised Defendant of his constitutional rights and requested a second statement. Putnam testified that Defendant waived his rights and, in the second statement, confessed. Defendant also informed Putnam that Hailey had beaten Dotson as they pulled him from the trunk of the car at the river. (Hailey admitted beating Dotson when he talked with Putnam, but denied it later during his testimony at trial.) Putnam then requested that Defendant's car be processed in an attempt to discover trace evidence such as blood, hair and fingerprints.

Charles Ray Blackwood, a Metro Police Department officer assigned to the identification section, testified that his job was to process crime scenes for evidence. On August 19, 1998, Blackwood received a request from Detective Putnam to process Defendant's car. As a result, Blackwood recovered numerous samples of blood which appeared as spatters, primarily in the area of the trunk. No blood spatters were discovered on the cover side of the trunk lid, however, which indicated that the trunk lid was up at the time the blood was shed onto the other parts of the vehicle. Blackwood performed numerous presumptive tests for blood, then sent the samples to the Tennessee Bureau of Investigation for further testing in accordance with standard departmental procedure.

Special Agent Constance Howard testified that she was employed with the Tennessee Bureau of Investigation crime laboratory as a forensic scientist specializing in DNA analysis. Howard received a request from Putnam to analyze various blood samples collected in connection with the Dotson murder. The tests confirmed that the blood samples given her belonged to the victim, Dotson.

Dr. John E. Gerber, an Associate Medical Examiner for Davidson County, testified that his specialty was forensic pathology. Dr. Gerber performed an autopsy on Dotson's body which revealed multiple causes of death: numerous blunt force injuries to the head, gunshot wounds to the left arm and flank, and drowning. The external exam of the body showed multiple lacerations to the head and superficial abrasions to the face and back. Dr. Gerber explained that laceration wounds were deeper than mere abrasions. The lacerations on Dotson's head tore his skin down to the skull bone. Dr. Gerber further testified that significant force was required to pierce 3/4 inch of scalp tissue and expose the skull. Even so, Dotson's lacerations were not life threatening in themselves-it would probably take a person with similar injuries several hours to bleed to death. Dr. Gerber was unable to determine whether Dotson suffered loss of consciousness during the beating.

Dr. Gerber testified that Dotson's autopsy also revealed two bullet wounds, one on his left flank and the other on the left side of his arm. The wound on his flank was superficial, only injuring skin, soft tissue and skeletal muscle. By contrast, the arm wound was more serious because it fractured a major bone and injured many more blood vessels. Yet, similar to the head wounds, Dotson's bullet wounds were not life threatening in themselves.

Dr. Gerber was asked why the cause of Dotson's death was listed as three different reasons when two of them, the bullet wounds and the head injuries, were characterized as non-life threatening. Dr. Gerber responded that, in this case, there was a series of events-three separate types of injuries-which must be considered together. Dr. Gerber explained that when Dotson arrived at the morgue he had an extreme amount of foam around his nose, mouth, and the most distal branches of his lungs, which indicated death by drowning. This evidence was merely helpful, however, not specific. For example, since it typically takes four to six minutes to lose consciousness when drowning and a person can usually be revived from that state, if the bullet wound in Dotson's left arm had incapacitated Dotson so that he could not get out of the water within that time, the arm wound could be classified a cause of death. Dr. Gerber further testified that he could not tell from the evidence whether Dotson's head was actually held under water.

Dr. Gerber was shown photographs of the circle of blood spatter discovered on the trunk area of Defendant's car and asked whether a person would have to be alive in order for the blood spatter to appear as portrayed in the photos. Dr. Gerber answered yes, and explained that the heart would have to be pumping in order for blood to reach the distances shown in the photos. Dr. Gerber further explained that when a person is dead, the blood vessels do not contain the amount of pressure necessary to spatter the blood a great distance if or when the vessel is severed. On cross-examination, Dr. Gerber admitted that blood spatter is extremely controversial

and it is difficult to be specific. Dr. Gerber illustrated with the following: "if you're going to take a huge amount of pressure and slam a person with an axe or something that's dead [sic], yes, the blood could spatter quite significantly." In general, a pumping heart causes pressure so that blood will usually spatter much more when a person is alive than when dead.

The defendant, John Charles Johnson, testified that he did not kill Joe Dotson and further, that on August 16, 1998 he had no knowledge that his friend, Jeremiah Hailey, wanted to kill Dotson. Defendant testified that at 12:00 noon on August 16, 1998, Defendant was sitting at home with his parents. They were preparing Sunday dinner when Defendant received a phone call from Hailey. Hailey wanted Defendant to join him for drinks and to watch the races. By the time Defendant arrived, Hailey was visibly intoxicated. Defendant ordered a beer and continued to drink with Hailey for the remainder of the day. When they left the bar, they drove to O'Charley's restaurant and later to a club called Silverado's. At Silverado's they split up for a while, but then left together at approximately midnight in search of "something to do." By this time they were both highly intoxicated. They stopped at the top of Percy Priest Dam and talked about life in general for a while. Eventually, the conversation turned to the subject of Hailey's sister. Hailey told Defendant about his sister's house. Hailey said he was helping to "get it ready" and invited Defendant to come and see it. Because they had nothing else to do, Defendant agreed.

Defendant testified that on the way to Hailey's sister's house (where Dotson was living at the time), Defendant and Hailey stopped by Hailey's house to get money for gas. Hailey was inside for only a couple of minutes. When they finally arrived at Hailey's sister's house, Dotson answered the door, let them inside, and then disappeared with Hailey into the back of the house. Defendant waited in the living room with Dotson's cousin. Defendant testified that he could only vaguely hear the conversation going on between Dotson and Hailey. When Hailey and Dotson returned to the living room, Hailey asked Defendant whether he would mind driving them to Old Hickory lake to see a car. This was the first that Defendant had heard anything about a car, but he agreed.

Defendant testified that during the drive to the lake, Hailey and Dotson were laughing together and everything seemed fine between them. When they arrived and no one was there to meet them, they all got out of the car to wait. About 4 a.m., Defendant suggested that they give up and go home. Defendant started walking back to the car. Then Dotson expressed his displeasure that the Mexicans did not show up, and Hailey responded "f--- you." When Dotson seemed surprised at this outburst and asked what was going on, Hailey replied "I'm going to kill you." Dotson acted like he did not believe Hailey until Hailey started shooting. Defendant yelled at Hailey to stop. Dotson was running at this point, but he was running toward Defendant. Defendant did not want to get shot, so he pushed Dotson away from him and hid

9

behind the car. Hailey chased Dotson to the edge of the water, still firing at him, and Dotson jumped into the lake.

After Dotson ran into the water, Hailey walked back to where he first started firing and proceeded to pick "things" up off the ground. Dotson's body was lying in the water. It appeared to be shaking for a while, then quit. Defendant ran into the water and pulled Dotson out. He did not hold his head under the water. Dotson looked dead at this point. Hailey argued that Dotson was not dead, but Defendant thought otherwise. Defendant wanted to leave, but Hailey said "No, we're not going to leave him." Rather than argue and risk getting shot himself, Defendant helped Hailey load Dotson into the trunk of the car. They drove to the boat dock on the other side of the lake, backed down the ramp, and started to unload Dotson from the trunk when a large amount of money fell out of Dotson's sock. Hailey picked the money up, put it in his pocket, then started beating on Dotson. When they finally got the body into the water, they gave it a shove and then got back into the car and drove away. Hailey threw the gun into Stone's River on the way back. Hailey tried to give Defendant half of Dotson's money when they arrived at Hailey's house. At first Defendant refused, but Hailey was insistent. Defendant took some of the money, but threw it out the car window on his way home.

Defendant testified that Hailey's mother gave Defendant and Hailey a ride to the police station the next day. On the way, the three of them discussed what they would tell the police. Ms. Hailey warned them that they needed to "get [their] stories straight." Their plan was to corroborate each other's version of the incident and, hopefully, stay out of jail. Defendant and Hailey decided to tell the police that they left Dotson at the lake with some Mexicans who wanted to sell him a stolen car. Consequently, Defendant's first statement to the police concerned the Mexicans and was false. Defendant testified that his second statement to the police and his testimony in court were the "true" versions of the incident.

During cross-examination, Defendant admitted that he did not speak with any Mexicans at Silverado's but said that Hailey may have. If Hailey did, however, he neglected to tell Defendant about the conversation. The State then referred Defendant to a portion of his second statement, the "true" version, where Defendant described the Mexicans as follows: "[j]ust these guys we'd met. They were Mexicans. We met them at Silverado's." Defendant responded that this particular statement was taken "out of context."

Sheila Ashworth, Dotson's sister, testified that Dotson and Hailey's sister, Wendy, had divorced but that they had also reconciled before he was killed. Ashworth further testified that Wendy and Dotson were happy and had recently moved into a new home. Although the couple had "problems" and a history of breaking up, they always somehow got back together. Wendy committed suicide a year after Dotson's murder.

10

State v. Johnson, 2001 WL 208512, at *1-7.

## B. Conclusions of Law

Petitioner's habeas petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Lindh v. Murphy, 521 U.S. 320, 336 (1997). Under the AEDPA, federal courts may not grant habeas relief for claims adjudicated on their merits in a state court proceeding, unless that state court proceeding:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 413 (2000), the Supreme Court stated that a state court judgment is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court on a set of materially indistinguishable facts." The Supreme Court interpreted the language "clearly established Federal law, as determined by the Supreme Court of the United States" as referring to "holdings, as opposed to dicta" of its decisions "as of the time of the relevant state-court decision." Id. at 412.

In Greene v. Fisher, 132 S. Ct. 38, 44 (2011), the Supreme Court considered whether "'clearly established Federal law' includes decisions of this Court that are announced after the last adjudications of the merits in state court but before the defendant's conviction becomes final" and answered the question in the affirmative. There, a Supreme Court decision at issue was rendered two

11

months after the state supreme court upheld the petitioner's convictions. The Supreme Court held that its decision was not clearly established at the time of the state supreme court's decision. Id. . The Supreme Court noted a different result if the Petitioner had applied for the writ of certiorari or had filed a state post-conviction petition. Id. at 45.

In Bell v. Cone, 535 U.S. 685, 693 (2002), the Supreme Court reiterated that the AEDPA modified a federal court's role in reviewing state prisoner applications "in order to prevent federal habeas 'retrials' and to ensure that state court convictions are given effect to the extent possible under the law." Under the "unreasonable application" clause, a state court judgment results in an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id. The Supreme Court explained that a state court's application of clearly established federal law must be "objectively unreasonable," and a federal habeas court may not grant habeas relief "simply because that court concludes in its independent judgment that the relevant decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A state court's application of federal law is unreasonable and habeas relief may be granted if the "state court decision is so clearly incorrect that it would not be debatable among reasonable jurists." Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir. 1998) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996)).

In deciding habeas claims, the Supreme Court reiterated that such claims are to be decided on the record before the state court:

> In this and related contexts we have made clear that whether a state court's decision was unreasonable must be assessed in light of the record the court had before it. See Yarborough v. Gentry, 540 U.S. 1, 6, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (per curiam)

12

> 124 S.Ct., at 4 (denying relief where state court's application of federal law was "supported by the record"); Miller-El v. Cockrell, 537 U.S. 322, 348, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (reasonableness of state court's factual finding assessed "in light of the record before the court"); *cf.* Bell v. Cone, 535 U.S. 685, 697, n. 4, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).

Holland v. Jackson, 542 U.S. 649, 652 (2004) (emphasis added). The district court also "must presume that all determinations of factual issues made by the state court are correct unless the Defendant can rebut that presumption by clear and convincing evidence." Mitchell v. Mason, 325 F.3d 732, 738 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)). This presumption includes credibility findings of the state courts. Skaggs v. Parker, 235 F.3d 261, 266 (6th Cir. 2001).

### 1. Procedural Default

Respondent asserts that the procedural default doctrine bars consideration of all of Petitioner's claims. In his third appeal that consolidated the state post-conviction and coram nobis action, Petitioner raised the following claims of ineffective assistance of counsel.

> On appeal, the petitioner raises several issues for post-conviction relief. Namely, the petitioner contends that he received ineffective assistance of counsel, the State committed prosecutorial misconduct, and the trial court should have instructed the jury on all of the lesser-included offenses of first degree murder.
>
> 1. Counsel failed to file and pursue a motion to suppress the petitioner's statements to police;
>
> 2. Counsel failed to adequately investigate prior to trial and present all relevant witnesses at trial;
>
> 3. Counsel failed to consult with the petitioner and prepare him for trial;
>
> 4. Counsel failed to object to testimony relating to the suicide of the victim's wife;
>
> 5. Counsel failed to object to Dr. Gerber's testimony regarding blood spatter evidence;

6. Counsel failed to adequately cross-examine the petitioner's co-defendant, Hailey;

7. Counsel failed to request all lesser-included offenses and preserve the issue on appeal;

8. Counsel failed to prepare for and conduct the petitioner's sentencing hearing;

9. Counsel failed to consult with the petitioner regarding his appeal and failed to preserve the appropriate issues; and

10. Counsel's cumulative errors prejudiced the petitioner.

Johnson, 2006 WL 721300, at *9, *10. In that consolidated appeal, Petitioner did not cite Blakely or Apprendi and did not argue their principles in his brief. (Docket Entry No. 28-8 at 55-57). In another appeal, Petitioner did cite Blakely and Apprendi on whether those decisions applied to consecutive sentencing, (Docket Entry No. 28-16 at 27-28, n.11). The Tennessee appellate court cited its precedents that Blakely does not apply retroactively. (Docket Entry No. 28-18 at 6).

The Procedural Default Doctrine bars consideration of a federal claim in a habeas action that was not presented to the state court or was decided on state law grounds.

> [T]his Court will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment. This rule applies whether the state law ground is substantive or procedural. In the context of direct review of a state court judgment, the independent and adequate state ground doctrine is jurisdictional. Because this Court has no power to review a state law determination that is sufficient to support the judgment, resolution of any independent federal ground for the decision could not affect the judgment and would, therefore, be advisory.
>
> ... The doctrine applies also to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement. In these cases, the state judgment rests on independent and adequate state procedural grounds.

Coleman v. Thompson, 501 U.S. 722, 729-30 (1991) (emphasis added and citations omitted).

14

Yet there is a presumption of no procedural default if the state court decision "fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of [the] state law ground is not clear from the face of the opinion . . . ." Id. at 733 (quoting Michigan v. Long, 463 U.S. 1032, 1040-41 (1983)). Further, this doctrine applies only to "firmly established" and "regularly followed" state procedural rules. Ford v. Georgia, 498 U.S. 411, 423-24 (1991).

Here, the state record does not reflect that Petitioner raised his ineffective assistance of counsel claims on Blakely or the remand issue. The state courts never had an opportunity to decide those claims. There is not any dispute that these claims would be time barred and deemed waived under applicable Tennessee laws that are enforced for procedural default analysis. See Wright v. Bell, 619 F.3d 586, 601 (6th Cir. 2010). In Hutchison v.Bell, 303 F.3d 720, 738-39 (6th Cir. 2002), the Sixth Circuit analyzed Tennessee's statute of limitations statute on post-conviction petitions and notwithstanding an exception, found that the state courts regularly enforced this established rule. Under these cicumstances, the Court concludes that the Petitioner's procedurally defaulted on his claims in this action that therefore must be dismissed.

An appropriate Order is filed herewith.

**ENTERED** this 3rd day of June, 2013.

WILLIAM J. HAYNES, JR.
Chief Judge
United States District Court.